LEAVELL v. STATE.

[92 South. 630, No. 22438.]

HOMICIDE. *Manslaughter instruction may be refused where there is no evidence to sustain it.*

In a trial for murder, where the evidence for the state makes out a clear case of murder, and the defendant's evidence a clear case of self-

defense, and there is no evidence that there was heat of passion, it is not error to refuse a manslaughter instruction requested by the defendant.

APPEAL from circuit court of Hinds county.

HON. W. H. POTTER, Judge.

George Leavell was convicted of murder, and he appeals.

Affirmed.

*C. N. Floyd,* for appellant.

The court erred in refusing the appellant a manslaughter instruction which reads as follows, to-wit: No. 7. "The court instructs the jury if you believe from the evidence that the defendant and the deceased were arguing, and during such heated discussion of some facts regardless how they might have come about to be in such discussion and that the defendant without malice aforethought, but in the heat of passion, in a cruel and unusual manner, without authority of law, and even not in necessary self-defense, killed the deceased, then you would not be warranted in returning a verdict of murder, but would be warranted in returning a verdict of manslaughter."

In sustaining the contention of appellant as to his right to the manslaughter instruction I will call the court's attention to page 80 of the official stenographer's notes, you will see that this defendant testified that the deceased, Ike Hubbard, call defendant a "damn lie" and "a God damn lie" "and broke at me;" while it is the law that words alone, regardless how provoking they might be, are not sufficient to reduce an intended murder to manslaughter without the use of an assault, but in the testimony of the defendant you will find that there was an assault, and that this motion toward the defendant with the words as used by the deceased is sufficient to show elements of manslaughter.

On page 85 the defendant stated in response to a question by counsel for the state, that he had nothing against

the deceased, thereby showing that he held no malice or grudge against the deceased. It will be noticed that in this case the state shows by their testimony, that the defendant and deceased quarreled about five minutes after meeting in the road down in the field where the homicide took place as is shown on page 7 by the testimony of the wife of the deceased on direct examination. On page 7 she testifies, among other things, that the defendant shook his finger in the face of her husband (the deceased), and on page 22 she states that she (witness) could hear them talking (meaning the deceased and the defendant); therefore it is insisted that such conduct by the defendant and the deceased show anger and heat of blood which is a necessary element of manslaughter.

With the absence of the testimony of one Carl Hill, there is not the least action by word or otherwise that go to show that the defendant premeditated murder. It is true that Mr. Hill's testimony was to the effect that the defendant said that he would kill the deceased before the sun went down. This can be taken and considered as facts against the defendant, and then should the instruction have been given to the jury on manslaughter, then the testimony of the defendant would have gone to show that his action and his testimony corroborated by Mr. T. B. Dewees (see page 32) wherein Mr. Dewees stated that the defendant called for squirrel shot No. 6 was to the effect that he had abandoned such intention, and that he was on a peaceful mission and was not looking for big game.

This defendant's right was defeated by the action of the court in refusing to grant the requested instruction, as the jury was cut off from considering any facts but that the defendant was guilty of murder or was not guilty, of any crime. This jury was sworn to take the instruction of the court as to the law and from that, with the facts in the case make up their verdict, and in the case at bar they were denied the right that would have authorized them to consider all the facts as they came from the witnesses. Had the desired instruction been granted by the

trial court it would have been proper to call the jury's attention to the fact that this homicide was not premeditated, and that they would have the right to consider the evidence of the defendant with reference to the shells and other facts which is essential to go to make up the crime of manslaughter.

I contend that although the defendant is guilty of murder and a verdict accordingly would be proper, it is, nevertheless, the defendant's right to have the law given correctly to the jury. The jury in this case should not have been compelled to accept all of the testimony introduced by the state and to disbelieve all of the testimony introduced by the defendant. They were not, under this testimony, had the manslaughter instruction been given, bound to accept either the theory of the state or that of the defense as based upon the testimony.

The jury are the sole judges of the facts in the case as testified to, and in arriving at their verdict it is wholly within their province to believe or disbelieve all or any part of the testimony. Every lawyer well knows that the juries are quick to anticipate the views of the trial court and will, with the least inclination, follow what they believe, the wishes of the trial court, thereby not giving the defendant the consideration which by law he is entitled to in this case, had the manslaughter instruction been given; the jury could have believed that the deceased was the aggressor in the difficulty, and they could have also believed under the testimony that the appellant killed the deceased while the deceased was in the attempt to commit an assault and battery, upon the defendant, and that the killing was in the heat of passion, and not in necessary self defense. A verdict of manslaughter would have been sustained by the testimony.

To sustain my contention I cite the following authorities, to-wit: *Martin* v. *State,* 112 Miss. 365, 73 So. —; *Johnson* v. *State,* 75 Miss. 635, 23 So. 579; *Green* v. *State,* 37 So. 646; *Jones* v. *State,* 98 Miss. 899, 54 So. 724; *Echols*

v. *State,* 110 Miss. 577, 70 So. 696; *Higgins* v. *State,* 83 So. 245.

In the case of *Martin* v. *State, supra,* this court said that: "If there are any elements of manslaughter under any of the testimony in the case, then a manslaughter instruction is proper, and should be granted either to the state or to the defendant," and there cited *Echols, supra.*

It seems that all the authorities hold that if the case would have been affirmed had the defendant been given a manslaughter instruction, that it would be reversible' error not to give same should it be asked, and in connection with that view of the law, allow me to call your attention to the case of *Higgins* v. *State, supra,* as that case is one that I am familiar with the facts and circumstances. It seems that the court held that there were elements of man slaughter in that case and was such that granting a manslaughter instruction was not reversible error, and that the evidence warranted it. The motion of the deceased in the *Higgins case, supra,* was similar to the motion of the deceased in the case at bar.

Whenever the life of a human being is in the balance, it is but just to him that the law governing the case be properly stated to the jury because it is within the province of the jury to pass upon the facts as given by the state and the defendant believing parts of either or both and disregarding such portions as they deem necessary for either the state or the defendant.

It is certainly within the province of the jury also to settle any issue of facts in the case, regardless as to whether testified by the defendant or by the state's witnesses, the jury must apply the facts to the particular case, but the defendant has the absolute right to have the facts of the case presented to the jury on instructions which state the law fully and accurately; therefore I earnestly insist that this case should be reversed and remanded for a new trial for the errors committed by the court.

*C. H. Dorroh,* assistant attorney-general, for the state.

The only question raised in this case is that of the court refusing the defendant a manslaughter instruction. Quite a few eyewitnesses to the scene testified that the deceased made no advance whatever on the appellant; that he was sitting on his horse with one hand on the horn of the sad-dle and his other hand back on the hip of the horse; that after a few minutes of conversation the appellant fired one shot into the body of the deceased which took effect in the heart; another shot was fired after the deceased had fallen to the ground, which entered his hip; and another shot which missed the body. All of the eyewitnesses were in plain view of the scene of the tragedy and no witness who was in view of the scene testified to the contrary. There is no evidence whatever in this record which would have warranted the court in granting an instruction for man-slaughter. Such an instruction would have been an error on the part of the court.

Attorney for the appellant cites several cases to sustain his contention that a manslaughter instruction should have been given; but the evidence in this case distinguishes it from any case cited by the appellant. When the appellant left his home on the morning of June the 17th he had a gun which he had borrowed from another person. On his way to Pocahontas, according to the testimony of one of the witnesses, he made a threat on the deceased to the effect that he would kill him before sundown. It seems that the appellant went to Pocahontas for the purpose or getting some shells to fit the gun which he had borrowed. After procuring the shells he returned to the field, or bot-tom, where the deceased was on horseback, and there met him and shot him to death. The testimony shows that no weapon of any description was found on the body of the deceased. Eyewitnesses all testified that the deceased made no effort whatever to advance on appellant, but that in-stead of advancing, he was at the mercy of the appellant and that being helpless, he threw up his hands when he was shot to death by the appellant.

There is not more than one view to be taken of the evidence of this case. If the evidence presented two views, then a manslaughter instruction would be correct. In the case of *Beverly Johnson* v. *The State,* 75 Miss. 635, the court seems to have held as stated above. The case of *Echols* v. *State,* 110 Miss 577, 70 So. 695, cited by the appellant, is distinguished from the case at bar in that the testimony in that case presented more than one angle from which the jury could view the case.

All of the cases cited by the appellant are not in point with the case at bar. The evidence in the case at bar shows that it was the intention of appellees to effect the death of the deceased. There is nothing in the evidence to show that he did not shoot without malice. If it had been to the contrary, the court would have erred in not giving a manslaughter instruction.

In the case of *Martin* v. *The State,* 112 Miss. 365, another case cited by the appellant, the evidence conflicting as to who was the aggressor in the fight, and an instruction on manslaughter was correct. In the case at bar, from the evidence there is no doubt as to who the aggressor was in the difficulty. There seemed to be no heat of passion or excitement in the case at bar, but that it was a deliberate design to bring about the death of the deceased. Appellee feels that justice has been done, and that the judgment of the lower court should not be interfered with, and submits that this case should be affirmed.

COOK, J., delivered the opinion of the court.

George Leavell was convicted of murder in the circuit court of Hinds county, and sentenced to suffer the death penalty, and from this judgment and sentence, he prosecuted this appeal.

The testimony offered by the state was substantially as follows: The wife of the deceased testified that, on

the day before the shooting, it was reported to her and the deceased that appellant had been caught in the woods with a girl who was then living with them and who had been reared in their home; that deceased chastised this girl for their conduct, but he did not see appellant that day; that on the following morning the witness was at a spring on the side of a hill where two girls were washing clothes; that while she was at this spring she saw the deceased sitting on his horse in his field in a valley below, about four hundred yards away, talking to a negro who was plowing for him; that she heard the report of a gun shot in the woods near by, and shortly thereafter· the appellant came out of the woods with a shotgun and walked rapidly towards the deceased; that they met near a path along which appellant was traveling; that deceased was sitting on his horse with one hand on the horn of the saddle and the other on the hip of the horse; that some conversation took place between them but she could not hear what was said; that a few moments later she saw appellant shake his finger in deceased's face and step back about two steps and raise his gun to ·shoot; that deceased threw up both hands and appellant immediately fired one shot and deceased fell to the ground; that appellant fired two more shots at or over deceased while the wounded man was attempting to crawl away from him. The two girls who were at the spring, and a man who was working on a fence about two hundred yards away from the scene of the shooting, testified to substantially the same facts.

The man who was plowing within a few steps of the scene of the shooting testified that deceased was sitting on his horse talking to him when appellant came out of the woods and approached them; that when they met some words passed between them and then appellant shook his finger in deceased's face and stepped back about two steps and raised his gun to shoot; that the deceased had been sitting on his horse with one hand on the saddle horn and the other on the hip of the horse; that when appellant

raised his gun into a shooting position, the deceased threw up both hands; that appellant then shot the deceased just over the heart on the left side of the breast; that deceased fell from his horse and, as he lay on the ground, appellant shot at him twice, the last time missing his mark; that deceased had no weapon, and when he was shot the first time he was sitting on his horse with both hands held above his head. Other witnesses testified that they saw the appellant that morning with a Winchester pump gun, and one witness, a merchant, testified that appellant came to his store a short while before the shooting; that he was carrying a Winchester shotgun; that he brought with him a chicken which he sold to the merchant; that, with the money derived from the sale of the chicken, appellant purchased six shells loaded with No. 6 shot. One witness testified that early that morning he went to deceased's blacksmith shop for the purpose of having some plow points sharpened; that while deceased was working on these plow points, appellant came to the shop; that he had a Winchester shotgun and a chicken; that appellant was a tenant on lands belonging to deceased; that deceased told him he wanted him to go to work on the grass in his crop; that appellant replied that he was not going to work that day; that appellant then walked off a few steps and turned and said to deceased, "I am going to kill you before the sun goes down."

Appellant testified that, on the day before the killing, on account of his relations with this girl, the deceased armed himself with a Winchester and went to his home and into the field looking for him; that he was very much frightened and avoided deceased; that next morning appellant's wife asked him to carry a chicken to the store to sell for the purpose of getting money to make certain small purchases for her; that in going to the store he traveled a circuitous route to avoid going by deceased's home; that in returning he also went about a mile out of his regular course to avoid meeting him; that he met the deceased unexpectedly. He further testified as follows:

"No sooner than he seen me he cut his conversation off and tapped his horse and went up the road where I was at, and he says, 'George Leavell, another time I hear anything of this girl and you I am going to kill you both. What were you doing in the bushes?' and I says, 'I wasn't there?' and he says, 'You are a damn lie,' and I says, 'No, I wasn't,' and he says, 'You are a God damn lie,' and broke at me, and I shot him twice; I don't know where I hit him at."

On cross-examination appellant testified in explanation of his statement that deceased broke at him, that he meant that he reached for his pocket. He further testified that he shot solely in self-defense; that he did not intend to kill deceased, but that he tried to shoot his arm so that he could not draw a gun from his pocket.

Upon this testimony the defendant requested an instruction submitting to the jury the question of manslaughter. This instruction was refused by the court, and the only assignment of error presented for our consideration is based upon the action of the court in refusing this instruction.

The majority of the court is of the opinion that, under the evidence in this record, it was not reversible error to refuse the manslaughter instruction.

Under the testimony for the state, if believed, the defendant is clearly guilty of murder, while under the defendant's own testimony, if accepted as true, the shooting was done solely in self-defense. The evidence offered by the defendant emphatically negatives any idea that the shooting was done in the heat of passion, but it shows a cool deliberation exercised in the defense of his person:. Upon the whole evidence we think the right result has been reached, and, upon the particular facts in this record, we do not think the refusal of the manslaughter instruction constituted reversible error, and the judgment of the lower court is therefore affirmed.

Affirmed, and August 18, 1922, is set as the date of execution.

*Affirmed.*

ANDERSON, J. (dissenting). We have in this case, according to appellant's own testimony, which is to be considered in passing on the propriety of a manslaughter instruction, a sudden meeting between appellant and deceased, followed immediately by a violent altercation between them, during which deceased cursed and abused appellant to such an extent as that in my opinion it was a question for the jury whether as a result thereof appellant's anger and passion were so aroused as to dethrone his reason and cause him to slay deceased. If that be true, appellant was guilty of manslaughter, not murder. Under the evidence this was a question for the jury and not the court. It was therefore error in my judgment for the trial court to refuse the manslaughter instruction requested by appellant.

SYKES, J., concurs in these views.

