PRINE v. STATE.

(Division B. Feb. 5, 1940.)

[193 So. 446. No. 34041.]

T. B. Davis, of Columbia, for appellant.

150

**W. D. Conn, Jr.**, Assistant Attorney-General, for the State.

Argued orally by **T. B. Davis**, for appellant, and by **W. D. Conn, Jr.,** for appellee.

**McGehee, J.,** delivered the opinion of the court.

The appellant, T. M. Prine, jointly indicted with his son, Joe Prine, was tried separately and convicted of the murder of D. S. Evans; whereupon, he was sentenced to serve a life term in the state penitentiary.

The controversy out of which the killing arose involved a dispute between Joe Prine and the deceased, Evans, as to the ownership of certain poles which previously had been cut and peeled at the instance of Joe Prine and his brother, Sam, and left in the woods where they were felled, on land claimed by the said Joe and Sam Prine under an unrecorded deed of conveyance, and which land was also claimed by the deceased under an alleged pur-

chase from a different grantor. It is not clear whether there was an alleged conflict in the descriptions contained in the respective conveyances under which they claimed title, or whether the deceased claimed that the poles in question were, in fact, located on land which he claimed to own, instead of being on the land described in the Prine deed.

The deed of conveyance held by said Joe and Sam Prine was offered in evidence by the appellant, for the purpose of showing that the deceased was committing a trespass under such circumstances as would reduce the alleged crime of murder to manslaughter, as provided by section 995, Code 1930; and also to show that the deceased, being a trespasser, was more likely to have been the aggressor in the difficulty. An objection to the introduction of this deed was sustained by the trial court, and that action is assigned here as error.

There was likewise excluded certain evidence offered by the state to prove that shortly before the killing a Mr. Langston had spoken to Joe Prine about buying some poles on this land, and that the latter referred him to the deceased, Evans; and that thereafter Prine assisted Langston, the purchaser from Evans, to cut the poles. In testifying in the absence of the jury Joe Prine admitted the incident above mentioned, and that he went with Langston when he bought the poles from the deceased; but explained that his vendors had not then succeeded in perfecting the title conveyed by his deed. The court held, however, that a trial of the question as to who had title to the land where the poles were cut was not essential or material to a proper determination of the issue then under consideration.

The testimony for the state did develop the fact, however, that the deceased claimed the land by purchase from one Hemphill; and the court likewise permitted Joe Prine to testify, on behalf of the appellant, that he and Sam owned the timber in question, and the land; that they bought it from "R. D. Ford and Mounger heirs," and that

they got a deed to it; but, as heretofore stated, the court did not permit the deed itself to be introduced, and also excluded the testimony of a surveyor, which was offered in the absence of the jury, to prove that the poles involved in the dispute were cut on the land described in this deed.

Therefore, in order to determine whether the court was in error, it is necessary that the issue then being tried should be stated,—keeping in mind that the court had a right to assume that the deceased, as well as the two sons of the appellant, claimed the land and timber in good faith, since Joe Prine had recognized the claim of the deceased shortly before the killing, as hereinbefore stated, and the law would not presume bad faith on the part of the Prines in the controversy out of which the killing arose.

On the day of the homicide the deceased had sent workmen, with a mule team, to "bunch" these poles in a pile, to be hauled next day to the railroad for shipment, when Joe Prine came along and saw them at work; whereupon he went to the home of appellant, where he found his brother, Sam, and obtained the deed upon which he based his claim of title. Returning to the woods accompanied by his brother, Sam, he offered to show his deed to the workmen, and was informed by them that they were merely "bunching" the poles for Evans, who would be there within a few minutes. Sam Prine then left the scene, Joe remaining until Evans arrived in his automobile, when, according to the testimony of all the eyewitnesses, other than Joe Prine and the appellant, a conversation ensued between them in regard to the ownership of the poles. The testimony for the state further shows that the deceased, who was partially paralyzed in his left leg and side, backed up to his automobile door, and pulled himself onto the front seat of the car for the purpose of accompanying his driver to his home to get something with which to repair the harness on the mule team; but before he had lifted his feet from the running board

into the car Joe Prine advanced toward him, asked what he was going to do about the poles, and forbade him to remove them; whereupon the deceased also forbade him to remove them, stating that he would have them all "bunched" and leave them there until the law determined who owned them. It was alleged that Joe Prine then drew his pistol, and snapped it as many as three times at the deceased, while the latter, steadying himself with one hand against the dashboard of the car, caught at the pistol with the other. At that moment the appellant suddenly appeared on the scene, from the direction of the rear of the car, placed his pistol near the body of the deceased, as evidenced by the wound and powder burn, and shot, killing him instantly.

On the other hand, according to the testimony of Joe Prine, the deceased was standing on the ground beside the running board of the car; and when he forbade him to remove the poles, he states that the deceased asserted that he was going to move them if he "had to kill every damn Prine by name," reached into the compartment in the dashboard of his car, and got his pistol, with which he tried to shoot him, and also pointed it toward his father, the appellant; whereupon the latter, approaching, shot him. That the deceased then turned, stepped onto the running board, and fell upon the front seat of the car, dropping the pistol on the floor of the car; that the witness then picked it up, placed it in the compartment in the dashboard and closed the door—thus undertaking to explain the fact that the pistol of the deceased was found in the locked compartment when the workmen arrived at his home with the body.

Some of the witnesses said that the appellant, after shooting the deceased, turned to them, and asked if they wanted some of the bullets.

The appellant corroborated Joe Prine to the extent that he says he first saw the pistol in the hand of the deceased; that he tried to shoot both Joe and the appellant; and also that some of the workmen tried to cut appellant with

their knives before he shot the deceased. Other circumstances were testified to, unnecessary to mention here for an understanding of the questions raised on this appeal.

The appellant does not claim to have heard the conversation between Joe Prine and the deceased with reference to the poles, but said that he just happened along, en route to the home of Mr. Langston, unaware that anyone was at the scene of the homicide until he arrived. Hence, it will readily be seen that so far as the appellant was concerned he did not claim to have killed the deceased while resisting an attempt to commit an alleged trespass, but to prevent deceased from killing him and his son. Therefore, section 995, Code of 1930, is inapplicable here; and hence no error was committed by the court below in limiting the evidence on the question of who had the better claim to the land in controversy. A person claiming wild and unoccupied land, in good faith, could not be guilty of a criminal trespass thereon. Upon this conflicting evidence we are not justified in disturbing the verdict.

After the appellant had introduced evidence of the bad reputation of the deceased for peace or violence, the state, in rebuttal, offered witnesses to show that the reputation of deceased, on the contrary, was good. Thereupon the appellant undertook to cross-examine these witnesses with reference to specific instances of supposed violence on the part of the deceased long prior to this homicide. The court sustained objections to this character of cross-examination, observing that it was not prepared to enter into a trial of each supposed act of violence to determine whether they were justifiable. In this the court was not in error. McCoy v. State, 91 Miss. 257, 44 So. 814; Bonds v. State, 164 Miss. 126, 143 So. 475; Herring v. State, 122 Miss. 647, 84 So. 699.

The giving of certain instructions, numbered three and four, on behalf of the state is also assigned as error. We deem it unnecessary to quote these two instructions at length, since it is sufficient to say that in all material particulars they were approved in the cases of Eaton v.

State, 163 Miss. 130, 140 So. 729, and McGehee v. State, 138 Miss. 822, 104 So. 150, respectively. Moreover, the instructions given the appellant clearly presented the issue of self-defense; and the several instructions are not in conflict in any material respect, when considered as a whole.

Finally, it is suggested that the court erred in refusing an instruction for appellant which, in substance, told the jury that a man has a right to protect his property, and to eject a trespasser, and to that end may use such force as may be reasonable and proper; that if the jury believed from the evidence that Joe and Sam Prine owned the poles in question, and had caused them to be cut and peeled, and that without any right or permission the deceased went upon their land, and was in the act of taking such poles therefrom, they had a right to protest against such action, and to use such reasonable force as may be necessary to prevent the deceased from taking such poles and removing them from the land; and that if the deceased undertook to take the poles by force, against the will of the said Joe and Sam Prine, then they, or either of them, had the right to use reasonable force to prevent his so doing; in which case the said T. M. Prine would have a right to be present at the scene of the killing, and to assist his sons, Joe and Sam Prine, in protecting their property.

It will be observed that the requested instruction is misleading, in that it seems to assume that a killing might be warranted under such circumstances; and secondly, the testimony in behalf of the appellant does not tend, as hereinbefore stated, to show that he killed the deceased to assist his sons in protecting their property, but rather that he killed him in self defense, and in defense of the life of his son, Joe Prine.

Upon a careful examination of the entire record, and a study of the several questions briefed and argued, we are of the opinion that no reversible error has been committed, and that the judgment must be affirmed.

Affirmed.